UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
IINDIANAPOLIS DIVISION

| | |
|---|---|
| GREGORY L. CONLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 1:14-cv-1586-RLY-DKL |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

Plaintiff Gregory L. Conley appeals the Acting Commissioner of Social Security's decision to deny him a period of disability and disability insurance benefits ("DIB") under Title II and supplemental security income benefits ("SSI") under Title XVI of the of the Social Security Act (the "Act"). *See* 42 U.S.C. §§ 405(g), 416(i), 423(d), 1382(c). Chief Judge Richard L. Young designated the undersigned to issue a report and recommendation. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. The decision should be affirmed.

I.  Background

Conley filed applications for DIB and SSI in June 2012, alleging disability beginning on March 1, 2010. He suffers from mitral valve prolapse ("MVP") (a heart condition in which a heart valve fails to close properly) with incidents of paroxysmal supraventricular tachycardia (episodes of rapid heart rate) and supraventricular

tachycardia ("SVT"); chronic obstructive pulmonary disease; gallstones; acute pancreatitis; and liver cirrhosis. He has past relevant work experience as a hotel maintenance supervisor, a detail manager at an automobile dealership, car wash supervisor, and janitor. The claims were denied initially and on reconsideration. Conley requested an administrative hearing, which was held before an Administrative Law Judge ("ALJ") on March 25, 2014. Conley, represented by counsel, appeared and testified. A vocational expert ("VE") also testified at the hearing.

*Heart Condition*

Conley has been diagnosed with MVP and mild enlargement of the left atria and left ventricle. An October 2012 echocardiograph revealed normal sinus rhythm, a normal mitral valve, and a normal ejection fraction, but a moderately enlarged left ventricle and mildly enlarged right and left atrium. [R. 291-92.] Conley has experienced episodes of paroxysmal supraventricular tachycardia and edema (swelling) in his ankles and feet. In February and June 2012, he sought treatment in the emergency room for a rapid heart rate. On each occasion, he was monitored and discharged the same day. In February, the emergency room physician noted Conley's history of MVP/PSVT and that he was on Propranolol (used to treat high blood pressure, irregular heart rate, and chest pain, among other conditions). [R. 272.] However, contrary to Conley's brief, the physician did *not* indicate that Conley was experiencing dyspnea (shortness of breath), dizziness, and lightheadedness. Instead, the physician used the null symbol (a zero with a slash mark through it), thus indicating that Conley had no chest pain, dyspnea, dizziness, or

2

lightheadedness. *See* Institute for Safe Medication Practices, List of Error-Prone Abbreviations, Symbols, and Dose Designations, http://www.ismp.org/tools/errorproneabbreviations.pdf (last visited Jan. 27, 2016).

In January 2013, Conley saw a cardiologist, Dr. Christopher Hollon, M.D., for SVT "with recent worsening symptoms" and MVP. [R. 341.] Dr. Hollon ordered a battery of tests and noted Conley's complaint of "intermittent nonexertional chest discomfort." [*Id.*] An electrocardiogram demonstrated sinus bradycardia, but was otherwise normal. [*Id.*] The physician noted that Conley was negative for dizziness and lower extremity edema was "absent." [R. 342.] At a follow-up visit in February 2013, it was noted that Conley "had no chest discomfort suggestive of ischemia" and he denied edema. [R. 345.] The physician wrote that he "has no symptoms attributable to valvular heart disease." [*Id.*]

Dr. Barr noted on February 8, 2013, that Conley had occasional episodes of dyspnea (shortness of breath) and chronic palpitations, MVP, and mitral regurgitation (mitral valve fails to close tightly, allowing blood to flow back into the heart). [R. 610-11.]

On June 25, 2013, Conley saw Dr. John Miller, M.D. for complaints of edema (i.e. swelling) in his ankles and feet of 2 weeks duration. [R. 607.] The physician noted the following "pertinent negatives": "bruising, crepitus, decreased mobility, difficulty initiating sleep, fever," joint locking, pain, stiffness, and limping. [*Id.*] Dr. Miller did observe edema on examination. [R. 609.]

A July 2013 electrocardiograph revealed a normal ejection fraction, unremarkable mitral valve with "mild mitral regurgitation," an enlarged left ventricular cavity and right atrium, and a normal tricuspid valve with mild tricuspid regurgitation. [R. 380-81.]

Dr. King G. Yee, who interpreted the electrocardiograph, concluded that the left ventricular systolic function was normal and the left ventricular ejection fraction was unremarkable, with mild MR/TR (mitral regurgitation/tricuspid regurgitation) with pHTN (pulmonary hypertension). [R. 381.]

The next month, on August 26, Conley saw Nurse Lisa Gregory, RN, for a cardiology appointment with complaints of increased swelling in his ankles and feet. [R. 348.] He denied chest pain, chest pressure, dyspnea and syncope/dizziness. [*Id.*] On examination, the nurse noted that he had "2+ pitting edema bilaterally." [*Id.*] She started him on Lasix (20 mg once a day) for moderate, bilateral edema. [R. 350.] In her review of symptoms, however, Nurse Gregory noted that Conley was positive for dizziness and negative for depression. [R. 349.] On September 9, Conley again saw Nurse Gregory, stating that his edema worsened in the evening such that he was unable to wear shoes. [R. 351.] On exam, the nurse noted "1+ pitting edema" of the ankles. [*Id.*] In her review of symptoms she noted that he was negative for dizziness and depression. [R. 352.] Nurse Gregory noted that Conley's bilateral edema was mild. She increased his Lasix from 1 to 2 tablets of 20 mg a day. [R. 353.]

On September 23, Conley reported to Nurse Gregory that his edma had improved with the Lasix and Ted hose. [R. 354.] He denied any chest pain, chest pressure, dyspnea, and swelling in his lower extremities. [*Id.*] It was again noted that Gregory was negative for depression. [R. 355.] On exam, Nurse Gregory noted mild, bilateral edema. [*Id.*] He was to have a follow-up appointment with the cardiologist in 3 months.

On December 19, 2013, Conley's primary care physician Dr. David Barr, M.D., wrote that Conley had "years of nonexertional chest pressure, and 1-2 beat palpitations." [R. 601.] Dr. Barr noted edema of the extremities. [R. 602.] However, Conley had recently stopped taking his Lasix, which he was taking to reduce edema. [R. 600.]

*Other Physical Impairments*

Conley suffers from other physical impairments as well. He has diabetes mellitus. [R. 425.] A pulmonary function test in January 2013 demonstrated mild airflow obstruction. [R. 314.] The physician noted that Conley "may benefit from bronchodilator therapy." [*Id.*] In January 2013, Conley had a liver ultrasound because of abnormal liver function; the ultrasound showed a slightly enlarged liver, suggestive of mild fatty change, and possible gallstones. [R. 327.] In December 2013, he was diagnosed with "mild COPD" and basal fibrosis (scarring of the lungs). [R. 634.]

In mid-December 2013, Conley was admitted to the hospital for two days for acute pancreatitis. It was determined that he also had cirrhosis of the liver with high liver function tests and mobile gallstones. [R. 424.] He was discharged home in stable condition, but advised to follow-up with gastroenterology and his primary care physician for liver function testing. [R. 424-25.] Later that month, Dr. Barr indicated that Conley's pancytopenia (deficiency of all types of blood cells) and cirrhosis of the liver were "controlled." [R. 599-600.]

In January 2014, Conley was seen by Dr. Dejuania A. Brown, D.O., because of his diagnosis of pancytopenia. He complained of "mild fatigue" [R. 570] and "mild edema

of his extremities." [R. 573.] Physical examination revealed no edema of the extremities. [R. 571.] It was recommended that he have repeat blood work; a bone marrow biopsy was not recommended since the doctor believed that Conley's cirrhosis and heptosplenomegaly (enlargement of both the liver and spleen) could be causing the blood counts. [R. 575.] Conley was advised to see gastroenterology about his cirrhosis and pancreatis. [R. 571.]

*Consultative Exams and Opinions*

On July 31, 2012, Medicaid referred Conley for a psychological examination conducted by psychologist Amber Whited, Ph.D. [R. 358-61.] Conley denied a history of psychiatric diagnoses, but reported a history of depression, fatigue, and panic attacks triggered by being in crowds. [R. 359.] White diagnosed panic disorder with agoraphobia and major depressive disorder, recurrent, in partial remission. [R. 360.]

On September 15, 2012, Conley had a consultative exam conducted by state agency physician, Dr. Kurt Jacobs, DO. [R. 283-89.] Dr. Jacobs noted that Conley had experienced a number of problems, including vertigo, tinnitus (i.e. ringing in the ears), shortness of breath, chest discomfort and pain, abdominal pain, arthritis, back pain, joint pain, and dyspnea on exertion. [R. at 283-84.] On examination, he noted "signs of dyspnea with minimal exertion" but "no signs of fatigue with minimal exertion." [R. 285.] The doctor assessed grip strength as 4/5 and noted that Conley was able to button, zip, and pick up coins" although he had "[s]ensation loss in arms and hands." [*Id.*] Dr. Jacobs opined that Conley "suffers from fatigue and dyspnea secondary to MVP; it will

6

probably not improve with time." [R. 285.] He also found that Conley had "back pain from bulging disc." [*Id.*] Dr. Jacobs opined that Conley's sitting and standing were limited to 15-30 minutes each, his walking was limited to 1 block, and his pushing, pulling, lifting, and carrying were limited to 0-10 pounds. [R. 286.]

In September 2012, a state agency medical consultant, Joelle J. Larsen, Ph.D., determined that Conley had no medically determinable mental impairments. [*See* R. 81-82.] She noted that depression was mentioned at the mental consultative exam, but Conley did not allege a mental impairment, he never sought treatment from a psychologist or psychiatrist, he was not taking any medications for a psychological impairment, and he said that his abilities were only limited due to his physical problems. [R. 81.] In February 2013, another state agency consultant, B. Randal Horton, Psy.D., reviewed the evidence and affirmed that assessment. [R. 98-102.]

On November 19, 2013, Nurse Gregory completed a Residual Functional Capacity Questionnaire in which she opined that Conley could sit for 60 minutes at a time, stand or walk for 30 minutes at a time, and only sit and stand or walk for one hour in a 8-hour workday. [R. 454.] She stated that he could frequently lift and carry less than 10 pounds, occasionally lift and carry 20 pounds, but never 50 pounds. [R. 455.] Yet she said that he was physically capable of working an 8-hour day, 5 days per week. [*Id.*]

*Hearing and ALJ Decision*

At the March 25, 2014 hearing before the ALJ, Conley testified about his impairments, including MVP, cirrhosis of the liver, pancreatitis, hepatic encephalopathy,

gall bladder, pancytopenia and his limitations. He said that the edema in his lower extremities made it difficult for him to walk or stand. [R. 67.] He takes Lasix to reduce the edema. [R. 57.] His cirrhosis and gallstones cause abdominal pain and made it difficult for him to bend or stoop. [R. 46-47, 56, 59.] Conley's physicians do not prescribe him aspirin, Tylenol, or other pain medication because of his liver disease. [R. 57-58.] Although his MVP is generally controlled by medication, at times he still experiences SVT (sudden onset of rapid heart rate). [R. 53-54.] Conley claimed to have chest pain "constantly" and 2 to 3 times a day, lasting for 20 minutes to 2 or 3 hours at a time. [*Id.*] He also claimed to suffer from dizziness from the Propranolol, which he takes to slow down his heart rate. [R. 51, 53.]

Conley stated that "a lot of times" his wife helps him get dress. [R. 47.] He lives in a "handicapped apartment" with low sinks, which allows him to wash dishes while seated. [R. 48.] He does no other household chores. [R. 47-48.] He doesn't go grocery shopping or prepare any meals. [R. 48.] He said that he does not "do crowds." [*Id.*] He reads, listens to music, and plays on the internet. His 5-year old grandchildren visit "about every day" and he plays with them while he is sitting. [R. 50.]

The VE, Constance R. Brown, a certified rehabilitation counselor, testified that given the RFC found by the ALJ, Conley could return to his past relevant work as a car wash supervisor, auto detailer, and utilities and maintenance supervisor. [R. 71-73.]

The ALJ determined that Conley met the insured requirements of the Act through September 30, 2011 [R. 19]; thus, he had to establish disability on or before that date to be entitled to a period of disability and DIB. The ALJ proceeded through the five-step

8

sequential process for analyzing disability claims. *See* 20 C.F.R. §§ 404.1520(a)(4) and 416.902(a). At step one, she found that Conley had not engaged in substantial gainful activity since his alleged onset date. At step two, she found that he suffered from severe impairments of mitral valve prolapse, tricuspid valve prolapse, history of supraventricular tachycardia, cirrhosis, diabetes mellitus, pancytopenia, and pancreatitis (inflammation of the pancreas). At step three, the ALJ found that he did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. At step four, the ALJ determined that Conley had the residual functional capacity to perform light work with the following restrictions: he could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; he could stand and walk 6 hours of an 8-hour workday and sit for 6 hours of an 8-hour workday; he could occasionally climb stairs and ramps, but never ladders, ropes, or scaffolds; and he could occasionally balance, stoop, kneel, crouch, and crawl. [R. 23.] Based on this RFC and the VE's testimony, the ALJ found that Conley could perform his past relevant work as a car wash supervisor, automobile detailer, and utilities and maintenance supervisor. The ALJ decided that he was not disabled under the Act. [R. 27.] The Appeals Council denied review, making the ALJ's decision final, and Conley sought judicial review.

II.   **Discussion**

   A.   **Standard of Review**

Title II of the Social Security Act provides for the payment of benefits to persons who have contributed to the program and suffer from a physical or mental disability.

Title XVI of the Act provides for the payment of disability benefits to indigent persons under the Supplemental Security Income (SSI) program. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). "Disability" is defined as the "inability to engage in any substantial gainful activity [because] of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last … not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also id.* § 1382c(a)(3)(A).

Judicial review of an ALJ's decision is limited. *See Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015). The decision will be upheld as long as the ALJ applied the correct legal standards and the decision is supported by substantial evidence. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Stepp*, 795 F.3d at 718 (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)). Where the ALJ provides specific reasons supported by the record for her credibility finding, the Court will not overturn her credibility finding unless it is patently wrong. *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015). An ALJ does not have to mention every piece of evidence but must build a "logical bridge" from the evidence to her conclusions. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015).

Conley first argues that the ALJ failed to evaluate Dr. Whited's opinion as to Conley's mental impairments and erred in failing to employ the "special technique" in evaluating the evidence of his mental impairment. *See* 20 C.F.R. §§ 404.1520a, 416920a. But he acknowledges that the ALJ's decision references Dr. Whited's opinion. [*See Pl.'s Br. Support Request Judicial Review*, dkt. 15 at 13 (citing R. 22 (citing Ex. 10F at 5 and noting

10

diagnosis of "a panic disorder and major depression")).] So Conley also argues that the ALJ erred in failing to articulate the weight given to Dr. Whited's opinion and in failing to analyze the relevant factors. It is clear, however, that the ALJ assigned little to no weight to Dr. Whited's opinion, and the decision reflects her reasoning for doing so.

The ALJ noted that Dr. Whited's diagnosis came at the end of a psychological evaluation; "examining relationship" is one of the factors to be considered. 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1). The ALJ explained that "this diagnosis is not cited elsewhere in the record," that "[n]o treating physician has prescribed medication or therapy," and that no progress notes indicate "evidence of psychological impairment." [R. 22.] And in the next paragraph of the decision (discussing the state agency medical consultants' opinions that Conley has no medically determinable mental impairment), the ALJ concluded that "the longitudinal evidence is insufficient to establish the presence of psychological medically determinable impairments." [*Id.*] Consistency with the record as a whole is another relevant factor, 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4), which the ALJ considered here. Although an ALJ must consider the factors set forth in the regulations, the written decision need not include "'an exhaustive factor-by-factor analysis.'" *Richards v. Colvin*, No. 1:14-CV-128-TLS, 2016 WL 336808, at *7 (N.D. Ind. Jan. 27, 2016) (quoting *Hanson v. Astrue*, No. 10-C-0684, 2011 WL 1356946, at *12 (E.D. Wis. Apr. 9, 2011)). Here, the ALJ considered and gave good reasons for disregarding Dr. Whited's opinion. And because the ALJ found that Conley had no mental impairment, she was not required to use the "special technique." *See* 20 C.F.R. §§ 404.1520a, 416.920a ("when we evaluate the severity of mental impairments ….").

Plaintiff next contends that the ALJ's finding that he is capable of light work "is untethered to any medical opinion." [*Pl.'s Brief Support Request Judicial Review* at 14.] He also argues that the ALJ failed to assess all of the required factors in rejecting Dr. Jacobs' opinion, that she mischaracterized Plaintiff's treatment, and that she failed to weigh the appropriate factors in evaluating Nurse Gregory's opinion. "[T]he determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide." *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) (citing 20 C.F.R. § 404.1527(d) (the final responsibility for determining your RFC is reserved to the commissioner)); *see also Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995) ("The determination of RFC … is an issue reserved to the SSA. … [T]he SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.") (citations omitted); *accord Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) ("[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question."). Thus, to the extent Conley suggests that the RFC finding had to directly correlate to a medical opinion or treatment record, he is incorrect.

As noted, an ALJ must consider the regulatory factors in evaluating medical opinion evidence, but she is not required to provide "an exhaustive factor-by-factor analysis." *Richards*, 2016 WL 336808, at *7 (quotation omitted). The ALJ gave good reasons for giving little weight to the opinions of Dr. Jacobs and Nurse Gregory. She noted that Dr. Jacobs was a consulting examiner (and thus not a treating source to whom more weight is generally given), and his opinion appeared to be based primarily on

12

Conley's subjective reports of fatigue and shortness of breath, whereas cardiac tests showed stable function and mild MVP, and other medical evidence suggested that Conley's fatigue was "mild."  [R. 26.]  "[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints."  *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).  Further, consistency with the record as a whole is an appropriate factor to consider in weighing medical opinions.  *See* 20 C.F.R. § 404.1527(c)(4).  In addition, the ALJ noted that Dr. Jacobs' report did not document any "considerable functional deficits."  [R. 26.]  Supportability of an opinion is another appropriate factor to be considered.  *See* 20 C.F.R. § 404.1527(c)(3).

Turning to Nurse Gregory, the ALJ's decision gave good reasons for giving her opinion little weight as well.  First, the record supports the ALJ's conclusion that the nurse's RFC assessment appears based only on Conley's foot and ankle edema as these are the only symptoms mentioned by her in her RFC Questionnaire. [R. 454.]  Yet, Nurse Gregory opined that his prognosis was good, which seems inconsistent with the restrictive functional limitations she gave.  And, as the ALJ observed, Nurse Gregory said that Conley's edema improved with Lasix and TED hose [R. 26 (citing R. 354)], and Conley's medical records support this conclusion [*see, e.g.*, R. 354 ("Edema: Improved with Lasix 20 mg … and Ted hose."), R. 571 (Dr. Brown's physical exam in January 2014 revealed "no edema of the extremities"); *compare* R. 348 (noting moderate edema on August 26, 2013), *with* R. 355 (noting mild edema).]  Again, consistency with the record as a whole is a proper consideration.  And the ALJ did not err in finding that Nurse

Gregory was *not* a medically acceptable source under 20 C.F.R. §§ 404.1513 and 416.913. Thus, the ALJ correctly determined that the nurse's opinion was not entitled to special or controlling weight. Nonetheless, the ALJ considered her opinion and gave it the weight the ALJ determined it deserved.

The ALJ noted that Conley had a history of chest pain and discomfort as well as abdominal pain [*see* R. at 21 ("the claimant has endorsed chronic chest pain and heart palpitations")] and that he was being treated for cardiac, gastrointenstinal impairments, and diabetes mellitus, which was controlled by diet. [R. 22, 25.] Although the ALJ may have overlooked that on two occasions (February 12 and June 25, 2012) Conley's SVT heart condition required him to seek emergency treatment, she did correctly note that his treatment consisted of medication. [R. 22.] To account for his cardiac and gastric disorders, the ALJ limited Conley to a range of light work. [R. 23.] Conley errs in equating his symptoms of chest discomfort, chest pressure, and palpitations with functional restrictions. [*Pl.'s Brief* at 14.]

Conley's third challenge is to the ALJ's credibility finding. He argues that the ALJ mischaracterized the evidence in finding that his complaints of pain and other symptoms were "not entirely credible" and that his allegations of side effects from medication were "inconsistent with treatment records." [*See* R. 24-25, 25-26.] The ALJ's finding that Conley's allegations of dizziness were inconsistent with treatment records is well-supported by the treatment records. Conley misreads the treatment record from his February 15, 2012 emergency room visit to state that he complained of dyspnea, dizziness and lightheadedness. [*See Pl.'s Br. Support Request Judicial Review*, dkt. 15 at 17 (citing R.

14

272).] Although Nurse Gregory noted in the "Review of symptoms" section of her office visit notes from August 26, 2013, that Conley was experiencing dizziness, this was in reference to his history of symptoms; she specifically noted that Conley "comes to the clinic today" and "denies any kind of shortness of breath …, chest pain/pressure, syncope/dizziness." [R. 348-49.] Similarly, twice the following month, she noted that Conley was "[n]egative for dizziness" [R. 352 (September 9, 2013 office visit), *see also* R. 355 (September 23, 2013 office visit).] Numerous other medical records indicate that Conley denied experiencing any dizziness to his medical providers. [*See, e.g.*, R. 342 (January 3, 2013 office visit with Dr. Christopher J. Hollon, M.D.), 348 (August 26, 2013 office visit), 573 (January 24, 2014 evaluation by Dr. Dejuania A. Brown).]

Conley argues that the ALJ mischaracterizes the evidence, but he does not dispute that the record supports the ALJ's conclusion that diagnostic studies showed a normal ejection fraction and left ventricular systolic function. While the ALJ did not discuss Conley's emergency room visits in February and June 2012, she did refer to Dr. Barr's treating notes, which document "[y]ears of nonexertional chest pressure" [R. 21 (citing Exhibit 18F at 12-13)], and stated that his treatment consisted of oral medication. [R. 22.] An ALJ need not explicitly discuss every piece of evidence. *See Varga*, 794 F.3d at 813. Conley even testified at the hearing that his MVP is generally controlled by medication, though at times he still experiences SVT (sudden onset of rapid heart rate). [R. 53-54.]

Next, Conley challenges the ALJ's finding that his liver cirrhosis and pancytopenia are "controlled" because the ALJ cited treatment records from December 2013 following his hospitalization for acute pancreatitis. But Conley points to no evidence to show that

his pancreatic flares were not isolated or that his cirrhosis and pancytopenia were not generally controlled by medication. Neither the fact that he was advised to follow-up with his primary care physician and gastroenterologist nor the fact that he would require monitoring of his blood counts undermines the ALJ's conclusion that his cirrhosis and pancytopenia were controlled. Conley submits that the ALJ's conclusion is undermined by his need for a liver transplant, but he has not provided the medical evidence of such a need. He cites to a brief dated May 23, 2014, submitted to the Appeals Council, which indicates that a treating nurse reported that Conley "suffers from end-stage liver disease" and "is being considered for a liver transplant." [*Pl.'s Br.*, dkt. 15 at 17-18 (citing R. 238-39).] The nurse's narrative is not included in the record, however. But even if it were, Conley fails to develop any argument that the existence of the note would entitle him to a remand and such an argument is therefore waived. *See, e.g., Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013).

Conley suggests that the ALJ equated his activities of daily living to an ability to work full-time. However, the ALJ did not simply equate his daily activities with an ability to engage in light work, which would have been error. *See Shumaker v. Colvin*, No. 15-1923, 2015 WL 8479517, at *4 (7th Cir. Dec. 10, 2015). Instead, she found that Conley's daily activities "reveal a significant level of function notwithstanding his alleged symptoms" and that his "activities demonstrate a greater level of function that [he] alleges." [R. 25.] The ALJ's consideration of Conley's daily activities in assessing his credibility as to the claimed symptoms and limitations from his impairments was proper. *See Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013).

Conley contends that the ALJ erred in failing to consider his excellent work history as supporting his credibility. While it is true that "[a] 'claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability,'" *Shumaker*, 2015 WL 8479517, at *5 (quoting *Hill v. Colvin,* No. 15–1230, 2015 WL 7785561, at *5 (7th Cir. 2015)), "work history is just one factor among many, and it is not dispositive," *id.* The ALJ did not mention Conley's work history, but that omission does not negate the other substantial evidence supporting her credibility determination.

Lastly, Conley argues that the ALJ erred because she failed to include in her RFC assessment all of his impairments, specifically his agoraphobia and major depressive disorder, and failed to account for his limitations and symptoms related to his heart condition, which require regular unscheduled breaks. When the ALJ relies on testimony from a VE, the hypothetical to the VE must include all of the claimant's limitations supported by the medical evidence in the record. *See, e.g.*, *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). The Court has already determined that the ALJ reasonably rejected Dr. Whited's opinion as to mental impairments and made a reasonable credibility determination. Thus the ALJ's hypoetheticals were not required to account for any alleged mental impairments or for limitations to the extent claimed by Conley.

## Conclusion

For the foregoing reasons, the undersigned recommends that the decision to deny benefits be affirmed.

**Notice Regarding Objections**

Within fourteen days of being served with a copy of this recommendation, either party may serve and file specific written objections thereto. 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2). The district judge shall make a *de novo* determination of those portions of the recommendation to which objections are made. 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(3). Failure to file an objection may result in forfeiture of the right to *de novo* determination by the district judge and to review by the court of appeals of any portion of the recommendation to which an objection was not filed. *Tumminaro v. Astrue*, 671 F.3d 629, 633 (7th Cir. 2011).

**The parties should not expect extensions of time to file either objections or responses. No replies will be permitted.**

ENTERED THIS DATE: 02/03/2016

*Denise K. LaRue*
Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Electronic distribution to counsel of record